IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:22-cr-63-WKW-JTA |
| | ) | |
| MAHORACE LAGUARIA JACKSON | ) | (WO) |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

This cause is before the court on Defendant Mahorace Laguaria Jackson's motion to suppress (Doc. No. 17), the Government's response in opposition (Doc. No. 36-1), and Jackson's reply thereto (Doc. No. 44). After due consideration of the parties' arguments, evidence, and applicable law, the undersigned concludes that the motion to suppress is due to be denied.

**I. PROCEDURAL HISTORY**

Montgomery police officers arrested Jackson after a warrantless search of his vehicle following a traffic stop on July 2, 2021. A grand jury charged Jackson in a four-count indictment on March 8, 2022. (Doc. No. 1.) The indictment charges Jackson with possession with intent to distribute powder cocaine in violation of 21 U.S.C. § 841(a)(1); possession with intent to distribute crack cocaine in violation of 21 U.S.C. § 841(a)(1); possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c); and possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1). Jackson entered a plea of not guilty to each count during his arraignment on March 11, 2022.

Jackson moves to suppress the evidence obtained from the search of his vehicle. The undersigned conducted a two-day evidentiary hearing on June 2, 2022[1] and August 11, 2022.[2] The motion is ripe for review.

## II. FINDINGS OF FACT

The testimony and evidence adduced at the hearing[3] demonstrate that on July 2, 2021, officers of the Montgomery Police Department ("MPD") were conducting surveillance at Jackson's residence.[4] Jeffrey Ioimo, a former[5] MPD officer, observed Jackson placing bags from his residence into his vehicle, a black Dodge Challenger. Jackson then departed his residence.

MPD Officers Todd Oliver and Christopher Brown initiated a traffic stop at the intersection of Carmichael Road and Perry Hill Road after they observed Jackson fail to utilize a turn signal before making a right turn. Officer Brown approached Jackson's passenger side window and made initial contact with Jackson.[6] According to Officer

---

[1] (Doc. No. 61, Transcript to Suppression Hearing, Volume I.)

[2] (Doc. No. 62, Transcript to Suppression Hearing, Volume II.)

[3] During the hearing, Officer Christopher Brown, Officer Todd Oliver, Officer Alexander Lindsay, Officer Cody Fabian, former Officer Jeffrey Ioimo, and Bill Barousse, Jackson's witness, all testified, and video evidence of the traffic stop was played.

[4] Jackson's residence is located at Young Farm Place in Montgomery, Alabama.

[5] On July 2, 2021, then-Officer Ioimo was working with the MPD in his capacity as a Bureau of Alcohol, Tobacco, Firearms, and Explosives task force officer. (Doc. No. 62, Tr. at 50.) In July 2022, he left the MPD to work for the Alabama Securities and Exchange Commission. (*Id.* at 49.)

[6] Before Officer Brown exited his vehicle, he informed someone named "Alex" of his location on "Perry Hill and Carmichael" Roads. (Gov. Ex. 2, 10:48:07-10:48:09.)

Brown, Jackson's windows were closed when he approached, so he tapped on the passenger window as a directive to Jackson to roll down the window. Jackson complied. Officer Brown requested Jackson's driver license and Jackson immediately handed his driver license to Officer Brown. Officer Brown informed Jackson that he was stopped because he did not use his right turn signal when turning onto Perry Hill Road. Officer Brown asked Jackson why he did not use his turn signal, and Jackson responded that he was "coming around the curve." As Officer Brown spoke with Jackson, Officer Oliver stood outside the driver side window. Officer Oliver testified that he motioned to Officer Brown to have Jackson roll down the driver side window. Officer Brown[7] directed Jackson to roll down his driver side window for Officer Oliver and walked away with Jackson's driver license. Jackson complied.[8] According to Officer Oliver, when Officer Brown walked away, Officer Oliver leaned in toward the driver window of Jackson's vehicle and smelled a "faint smell of marijuana." (Doc. No. 61, Tr. at 42, 43.)[9]

---

[7] During his interaction with Jackson, Officer Brown did not smell marijuana. He only smelled the multiple air fresheners which were hanging from the turn signal indicator on the steering column.

[8] (Gov. Ex. 3.)

[9] Officer Oliver asked a second officer who arrived later, Officer Cody Fabian, to conversate with Jackson to discern if he smelled marijuana because Officer Oliver wanted a second opinion. (Doc. No. 61, Tr. at 43-44, 45, 81); (Gov. Ex. 3 at 10:52:46-10:52:53) ("Go up there and conversate with him. Tell me if you smell any weed or anything. Okay?") Officers Oliver and Fabian testified to this account. Although Jackson challenges the content of this statement and avers that Officer Oliver stated, "We're going to tell them that we smell weed in there. Okay?" (Doc. No. 61 at Tr. 64), there is no evidence to support Jackson's version of the statement. The undersigned finds both Officers Oliver and Fabian to be credible witnesses. Both testified in a thoughtful, candid and consistent manner. Their testimonies withstood scrutiny on cross examination, and there are no material discrepancies between their testimony and the evidentiary record. Consequently, the undersigned makes the factual finding that Officer Oliver sought a second opinion from Officer Fabian in regard to the scent of marijuana. Officer Oliver testified that it was hard to smell the

Officer Brown returned to his vehicle. He contacted Officer Alexander Lindsay, a certified canine handler, and informed him of the location of the traffic stop. Two more officers arrived on the scene and Officer Brown informed them that the canine unit would arrive in thirty seconds. Officer Brown then attempted to run a warrant check. However, he "had a difficult time raising somebody to – to conduct that warrant check." (Doc. No. 61, Tr. at 12.) Officer Lindsay arrived on the scene and Officer Brown discussed with him how to proceed.[10] Officer Brown can be seen on the video, attempting to make telephone calls. Officer Oliver approached Officer Brown to inquire what he was doing, and Officer Oliver responded that "he cannot get through on the phone" to "run" Jackson. (Gov. Ex. 2 at 10:51:57-10:52:07.) Officer Brown then transferred the responsibility of the warrant check to Officer Oliver "who continued to try to raise someone to conduct the warrant check." (Doc. No. 61, Tr. at 13); (Gov. Ex. 3 at 10:53:56-10:54:01.)[11]

Officer Brown again approached Jackson's vehicle. Officer Brown asked Jackson to step out of the vehicle, informed him that he was not in any trouble, completed a pat

---

marijuana due to the smell of the air fresheners. (*Id*. at 44.) As directed, Officer Fabian communicated with Jackson at Jackson's vehicle and thereafter advised Officer Oliver that he did not smell marijuana. (*Id*. at 46, 64, 81.)

[10] Officer Brown testified that he talked to Officer Lindsay "about how to best conduct this scene in a safe manner for everybody involved." (Doc. No. 61, Tr. at 13.) Officer Brown's body camera recording supports his testimony. (Gov. Ex. 2 at 10:51:10-10:51:18)(Officer Brown asking Officer Lindsay how he wants to proceed.)

[11] On Officer Brown's body camera recording (Gov. Ex. 2), he stated that he was unable to get anyone on the phone to start the warrant check, provided Jackson's driver license to Officer Oliver and requested Officer Oliver to complete that task. Officer Oliver's body camera recording depicts the same conversation. (Gov. Ex. 3.) Officer Oliver was unable to complete the warrant check. (Gov. Ex. 3 at 10:55:20.)

down of him, and directed him to move to the rear of the vehicle. Jackson complied. Officer Brown closed the door to Jackson's vehicle. While located at the rear of Jackson's vehicle with Jackson, Officer Brown informed Jackson that he was going to have a canine unit walk around the exterior of the vehicle while they ran Jackson's name through the computer system.

Officer Brown directed Jackson to stand at the police vehicle. Officer Brown then returned to his vehicle and continued to seek someone to conduct a warrant check. Seven minutes after the traffic stop was initiated,[12] Officer Brown was able to secure someone to conduct the warrant check on Jackson and provided Jackson's information to that person. While Officer Brown awaited the results of the warrant check, Officer Lindsay conducted an exterior sniff of Jackson's vehicle with his canine unit, Skoot.[13] Skoot positively alerted to the presence of the odor of narcotics in the vehicle. During the exterior sniff of Jackson's vehicle, Skoot inserted his head into the passenger side window and driver side window before he alerted at each window. (Gov. Ex. 4 at 10:57:00, 10:57:15, 10:57:25.)

---

[12] (Gov. Ex. 2 at 10:47:27-10:54:40.)

[13] It appears that the time on each body camera recording was not synchronized with the others. For example, the time stamps for when Officer Lindsay informed Jackson of Skoot's alerts are different on each body camera recording. (Gov. Ex. 1 at 10:58:29; Gov. Ex. 2 at 10:56:41; Gov. Ex. 4 at 10:58:04.) Because the time on each recording was not synchronized, the undersigned relies on the brief passage of time that occurred between Officer Brown's receipt of the warrant check and Officer Lindsay's notification to Jackson of the results of the free air sniff, as both are shown on Officer Brown's body camera. Officer Brown received the information pertaining to Jackson's warrant status less than thirty seconds before Officer Lindsay informed Jackson that Skoot had alerted to the presence of the odor of narcotics. (Gov. Ex. 2 at 10:56:18-10:56:29, 10:56:41.) Officer Lindsay's body camera shows that the exterior sniff by Skoot lasted less than 60 seconds. (Gov. Ex. 4 at 10:56:46-10:57:36.) Hence, the free air sniff by Skoot began before Officer Brown received the results of Jackson's warrant check.

After Officer Lindsay informed the officers of Skoot's alert, the officers searched Jackson's vehicle. The officers discovered suspected narcotics and a firearm in the trunk of the vehicle and arrested Jackson.[14]

Jackson's vehicle was towed to the MPD Special Operations Division and the officers obtained a state search warrant for the vehicle. (Gov. Ex. 6 at 2.)[15] During the search of the vehicle, law enforcement recovered a firearm in the trunk and a blue backpack. The search of the blue backpack yielded plastic containers of Eutylone, powder cocaine, crack cocaine and marijuana residue.[16] The plastic containers were analyzed for fingerprints and Jackson's fingerprints were recovered from the containers.

### III. DISCUSSION

A. <u>Motion to Suppress and Responses</u>

Jackson asserts that the search of his vehicle violated the Fourth Amendment because (1) the detention was unlawfully prolonged beyond the time necessary to process the traffic citation, (2) the canine's insertion of its head into the interior of the vehicle constituted an illegal entry into the vehicle, and (3) the activity observed at Jackson's home and alleged detection of "faint odor of marijuana" do not establish probable cause for his

---

[14] No traffic citation was issued to Jackson for failing to signal.

[15] A copy of the search warrant was admitted during the hearing as Government Exhibit 6. It appears that the second page of the search warrant is missing.

[16] Ioimo testified that based on his training and experience the residue discovered in two plastic containers was marijuana residue. (Doc. No. 62, Tr. at 52-53, 71, 72.) There are no lab results which confirm this testimony because Ioimo did not submit that evidence for testing. (*Id*. at 71.) Ioimo submitted the other suspected narcotics to the laboratory for testing and received confirmation that the substances were Eutylone, cocaine base and cocaine. (Gov. Exs. 9, 10, 11.)

detention or search because these activities were not creditable indications of criminal activity. (Doc. No. 17 at 2, 6, 7.)

The Government responds that the traffic stop was initiated on probable cause supplied by Jackson's traffic violation of failing to use his right turn signal while operating his motor vehicle. (Doc. No. 36-1 at 7.) The Government also argues that the traffic stop was not illegally prolonged because the officers were working on a warrant check when the canine unit arrived. (*Id*. at 8-9.) The Government further argues Officer Oliver smelled marijuana emanating from the vehicle, thus giving him reasonable suspicion to search the vehicle. (*Id*. at 9-10.) Finally, the Government contends the canine's instinctive act of sticking its head in the vehicle's windows did not constitute an unlawful search. (*Id*. at 12-13.)

Jackson replies that the Government's reasoning for extending the traffic stop in order to allow the vehicle search by the canine unit fails under scrutiny. (Doc. No. 44.) He contends law enforcement's observation of him moving bags from his home to his vehicle is not an indication of illegal activity. (*Id*. at 1-2.) He also contends that Officer Oliver's reported smell of marijuana was not verified because no marijuana was found in the vehicle. (*Id*. at 2.) He further contends that the canine's behavior of inserting its head into the vehicle exceeded the handling officer's authority as well as the Montgomery Police Department's rules and regulations. (*Id*. at 3-4.)

B. Governing Legal Principles

"The Fourth Amendment guarantees '[t]he right of the people to be secure in their persons, houses, papers, effects, against unreasonable searches and seizures." *Whren v.*

7

*United States*, 517 U.S. 806, 809 (1996).  For purposes of the Fourth Amendment analysis, a seizure occurs "when the officer, using physical force or show of authority, has in some way restrained the liberty of a citizen."  *Terry v. Ohio*, 88 S. Ct 1868, 1889 (1968).  A traffic stop for a suspected violation of the law is considered a seizure of the vehicle's occupant and must be conducted by the Fourth Amendment."  *United States v. Braddy*, 11 F.4th 1298, 1308 (11th Cir. 2021).  To comply with the Fourth Amendment, an officer must have reasonable suspicion to conduct the traffic stop.  *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) ("All parties agree that to justify [a traffic stop], officers need only reasonable suspicion[.]" (quotation omitted)).

An encounter rises to the level of a brief seizure or investigatory detention if the officer has a reasonable, articulable suspicion that the individual has engaged in or is about to engage in criminal activity.  *Terry*, 392 U.S. at 24; *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) ("[E]ven in the absence of probable cause, police may stop persons and detain them briefly in order to investigate a reasonable suspicion that such persons are involved in criminal activity.")  "Even minor traffic violations qualify as criminal activity." *United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (*en banc*) (citations omitted).

Reasonable suspicion is determined from the totality of the circumstances, *United States v. Sokolow*, 490 U.S. 1, 8 (1989), and requires that the officer point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the investigative stop.  *Terry*, 392 U.S. at 21; *see also United States v. Pruitt*, 174 F.3d 1215, 1219 (11th Cir. 1999).  "While 'reasonable suspicion' is a less demanding

standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007); *see also United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). For a seizure to be valid, it must be "justified at its inception." *May v. City of Nahunta, Ga.*, 846 F.3d 1320, 1328 (11th Cir. 2017) (quoting *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). In determining whether reasonable suspicion existed at the relevant time, the court considers whether reasonable suspicion existed objectively under the circumstances. *See United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006).

Turning to the Fourth Amendment's proscription of unreasonable searches, the fundamental right to be free from unreasonable searches is "generally preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer upon a showing of probable cause." *United States v. Tamari*, 454 F.3d 1259, 1261 (11th Cir. 2006). "There are, of course, exceptions to the general rule that a warrant must be secured before a search is undertaken, one of which is the automobile exception." *Id*. (citing *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (per curiam)). "If a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment permits police to search the vehicle without more." *Dyson*, 527 U.S. at 467 (quoting *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)); *see also United States v. Mobley*, 808 F. App'x 899, 901 (11th Cir. 2020).

C. <u>Analysis of Jackson's Motion to Suppress</u>

    1. The traffic stop was lawful.

Here, the record reflects that the officers initiated the traffic stop after Officer Brown observed Jackson fail to utilize a turn signal before making a right turn. (Doc. No. 61, Tr. at 10; Gov. Ex. 2 at 10:48:35-10:48:39). Alabama law provides, in relevant part, that:

> (a) No person shall turn a vehicle or move right or left upon a roadway unless and until such movement can be made with reasonable safety nor without giving an appropriate signal in the manner hereinafter provided.
>
> (b) A signal of intention to turn right or left when required shall be given continuously during not less than the last 100 feet traveled by the vehicle before turning.

Ala. Code § 32-5A-133(a), (b). Although there is no video evidence of Jackson's alleged traffic violation, Officer Brown's credible testimony regarding his eyewitness observation and his assertion on his body camera recording stating the same establish reasonable suspicion to believe that Jackson violated Ala. Code § 32-5A-133. Jackson offered no evidence or argument to cast doubt on the veracity of Officer Brown's testimony. Therefore, the traffic stop was lawful.

    2. The traffic stop was not unlawfully prolonged.

The suitable duration of a police detention in the context of a traffic stop is determined by the seizure's "mission —to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted). In other words, a lawful traffic stop becomes unlawful "if it is prolonged beyond the time reasonably required to complete the mission" of issuing

10

a ticket for the violation. *Rodriguez*, 575 U.S. at 354-55 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)) (brackets and quotation marks omitted).

To detain a vehicle and its occupant past the time necessary to effectuate the purpose of the traffic stop, an officer must possess "[reasonable] articulable suspicion of other illegal activity." *United States v. Purcell*, 236 F.3d 1274, 1277 (11th Cir. 2001). "In determining whether reasonable suspicion is present, [a court] looks at the totality of the circumstances of [a] case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *Braddy*, 11 F.4th at 1310-11 (internal quotation marks omitted).

An officer completing a traffic stop may request to see a driver license, registration, and proof of insurance and detain the driver while inspecting these documents. *Purcell*, 236 F.3d at 1278; *Rodriguez*, 575 U.S. at 354-55. Such a request and inspection are "ordinary inquiries incident to the traffic stop" and "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Rodriguez*, 575 U.S. at 354-55 (internal quotation marks omitted and alteration adopted). In addition, an officer may make certain unrelated inquiries – such as asking whether there are any guns or drugs in the vehicle or conducting a dog sniff – provided the inquiries do not "measurably extend" the duration of the stop. *Arizona v. Johnson*, 555 U.S. 323, 333 (2009) (citing *Muehler v. Mena*, 544 U.S. 93, 100-01 (2005)); *Rodriguez,* 575 U.S. at 350-51, 354-55 (citing *Johnson*, 555 U.S. at 333; *Caballes*, 543 U.S. at 406-08). Simply put, if these unrelated inquiries are made while an officer is completing tasks related to the traffic infraction, they pose no Fourth Amendment problem.

*See, e.g., Purcell*, 236 F.3d at 1279-80 (holding inquiry as to whether there were any guns or drugs in the vehicle was constitutional because it was made while officer was conducting routine records check and preparing traffic citation and also justified by reasonable safety concerns); *Braddy*, 11 F.4th at 1312 (holding dog sniff conducted while officer was conducting routine records check and preparing traffic citation did not unlawfully prolong traffic stop). Reasonable suspicion supporting the extension of a traffic stop arises when a canine alerts to the odor of drugs in the vehicle. *Braddy*, 11 F.4th at 1312.

Because the traffic stop of Jackson's vehicle was lawful, the officers were permitted to conduct a warrant check on him. The evidence in the record establishes that during the traffic stop, Officer Brown ran a warrant check on Jackson to discover if he had any outstanding warrants. Officer Brown testified, and the body camera recordings support, that there was a delay in securing someone to conduct the warrant check. While the officers were attempting to complete the warrant check, Officer Lindsay arrived and began to walk his drug detection canine around the vehicle to detect the odor of potential narcotics. The free air sniff lasted less than 60 seconds and was conducted while Officer Brown was completing a task related to the traffic violation.[17] Accordingly, the dog sniff was lawful and did not prolong the stop.[18] *See United States v. Moton*, No. 218CR00534KOBSGC,

---

[17] Jackson tried to make hay out of the fact that he did not receive a ticket for the traffic violation. The undersigned is not persuaded by Jackson's argument as Officer Brown's exercise in discretion not to issue a traffic citation provides no basis for suppression of the evidence. *See e.g., United States v. Woods*, 385 F. App'x 914, 918 (11th Cir. 2018) (per curiam) ("[T]here is no constitutional requirement that a police officer issue a traffic citation.").

[18] Jackson argued there is "a six to seven-minute delay" in the stop because the officers were waiting for the canine unit to arrive. (Doc. No. 62, Tr. at 124.) The evidence of record simply does not support his argument. The undisputed evidence shows that Officer Lindsay was on the

12

2021 WL 5936984, at *4 (N.D. Ala. Nov. 10, 2021), report and recommendation adopted, No. 218CR0534KOBSCG1, 2021 WL 5927515 (N.D. Ala. Dec. 15, 2021) (finding free air dog sniff was lawful because it occurred while officer was completing tasks related to the traffic infraction).

Further, once Officer Lindsay's canine alerted to the odor of narcotics, the officers had probable cause for other illegal activity that justified the continued detention of Jackson to complete a search of his vehicle. The Eleventh Circuit has "long recognized that 'probable cause arises when a drug-trained canine alerts to drugs.' " *United States v. Tamari*, 454 F.3d 1259, 1264–65 (11th Cir. 2006) (quoting *United States v. Banks*, 3 F.3d 399, 402 (11th Cir. 1993)); *Hearn v. Bd. of Pub. Ed.*, 191 F.3d 1329, 1333 (11th Cir. 1999) ("Furthermore, the alerting of a drug-sniffing dog to a person's property supplies not only reasonable suspicion, but probable cause to search that property."). Hence, the traffic stop was not unlawfully prolonged.[19]

---

scene within less than three minutes of Officer Brown's receipt of Jackson's driver license. (Gov. Ex. 2 at 10:48:30 (Officer Brown receives Jackson's driver license); Gov. Ex. 2 at 10:51:07 (Officer Brown consults with Officer Lindsay regarding how to proceed).)

[19] Jackson spent much time during the hearing eliciting testimony regarding the canine's training. To the extent that Jackson is challenging the canine's reliability (Doc. No. 62, Tr. at 133) ("this dog test is tainted by . . . the dog's poor training and performance"), the undersigned finds that argument is without merit. In *Florida v. Harris*, the Supreme Court addressed which types of dogs can provide probable cause:

> If a bona fide organization has certified a dog after testing his reliability in a controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search. The same is true, even in the absence of formal certification, if the dog has recently and successfully completed a training program that evaluated his proficiency in locating drugs.

      3. The interior vehicle sniff by the canine was not an illegal search.

This court has eloquently stated the relevant law for evaluating an interior canine sniff.

> Unlike an exterior canine sniff, an interior canine sniff or search "is capable of revealing information beyond the location of contraband materials" and is governed by the Fourth Amendment. [*United States v.*] *Woods*, 445 F. Supp. 2d [1328,] 1332 [M.D. Ala. 2006]. If a dog instinctively migrates into the interior of a vehicle, the Fourth Amendment is not violated. *See [United States] v. Mostowicz*, 471 [F.] App[']x[] 887 (11th Cir. 2012) (collecting cases and holding that dog's entry into defendant's vehicle, which was not prompted by encouragement or facilitation from the officers, did not constitute a Fourth Amendment violation). . . .

*United States v. Anguiano*, No. 3:16CR342-WKW-SRW, 2017 WL 2766184, at *18 (M.D. Ala. Feb. 24, 2017), report and recommendation adopted, No. 3:16-CR-342-WKW, 2017 WL 2766449 (M.D. Ala. June 26, 2017).

The uncontroverted evidence of record shows that Officer Lindsay's canine instinctively inserted his head into Jackson's vehicle on three separate occasions. First, the canine inserted his head into the passenger window. (Gov. Ex. 3 at 10:57:12.) Then the canine walked around the trunk and returned to enter the passenger window again. (Gov. Ex. 3 at 10:57:22; Gov. Ex. 4 at 10:57:00.) Officer Lindsay testified that he did not

---

568 U.S. 237, 246–47 (2013); *see also United States v. Sentovich*, 677 F.2d 834, 838 n.8 (11th Cir. 1982) (endorsing the view that "training of a dog alone is sufficient proof of reliability"); *United States v. Nelson*, 309 F. App'x 373, 375 (11th Cir. 2009) (per curiam) ("A dog sniff must be sufficiently reliable in order to establish probable cause, and this reliability is generally present if the dog is 'well-trained.'" (quoting *Caballes*, 543 U.S. 405))). The record includes evidence of the drug detecting canine's successful MPD training and his completion of the True Canine International's training program. (Gov. Exs. 25, 26, 27, 28.) Jackson presented no evidence which conflicted with the certification provided by True Canine International, showed that True Canine International was not "bona fide," or refuted the canine's successful completion of the MPD training program. The undersigned thus proceeds with the presumption that the canine's positive alerts were reliable.

14

command the canine to jump up or insert his head into the window or enter the vehicle. (Doc. No. 61, Tr. at 103, 106.)  Officer Lindsay also testified that he uttered a correction to the canine because "he [was] doing a different conditioned response than he [was] trained to do at the beginning of his training." (Doc. No. 61, Tr. at 107.)  Officer Lindsay also testified that the canine's response was "an aggressive indication" so he corrected the canine "from the aggressive indication into a positive indication." (*Id*. at 107, 108.)  After the correction is made, the canine sat. (Gov. Ex. 4 at 10:57:04; Gov. Ex. 3 at 10:57:26.)  Officer Lindsay testified the "sit" by the canine was an indication of the "presence of the odor of narcotics." (Doc. No. 61, Tr. at 109.)

Third, the canine inserted his head into the driver window. (Gov. Ex. 4 at 10:57:14; Gov. Ex. 3 at 10:57:37.)  Officer Lindsay provided the same correction as before, and the canine retreated from the driver window. (Gov. Ex. 4 at 10:57:17-10:57:19.)  The canine then walked toward the trunk, reverted back toward the driver window and attempted to enter the window. (Gov. Ex. 4 at 10:57:18-10:57:25; Gov. Ex. 3 at 10:57:46.)  The canine fell from the window and then ultimately sat. (Gov. Ex. 4 at 10:57:29; Gov. Ex. 3 at 10:57:57.)  Officer Lindsay testified that he did not instruct the canine to enter the vehicle or make any motions for the canine to enter the vehicle. (Doc. No. 61, Tr. at 111.)  Further, Officer Lindsay testified that he did not instruct the canine to sit. (Doc. No. 62, Tr. at 20, 24.)

Here, there is no evidence that Officer Lindsay encouraged, directed or commanded the canine to enter the windows of Jackson's vehicle.  Jackson offered no evidence or legal authority to dispute the fact that Officer Lindsay's statement of correction to the canine

15

was not a command or cue to the canine to insert his head into the windows of the vehicle. Considering the evidence of record that the canine instinctively inserted his head into Jackson's vehicle without cuing or encouragement from Officer Lindsay, and the absence of any evidence to the contrary, the undersigned finds no Fourth Amendment violation.

4. The home activity and the faint smell of marijuana are of no consequence.

Jackson argues that neither his movement of bags from his residence to his vehicle nor Officer Oliver's assertion that he smelled marijuana emanating from Jackson's vehicle constitute probable cause to justify a search of the vehicle.  (Doc. No. 44 at 1-2.)  The undersigned finds that these actions are of no consequence to the constitutional inquiry. The record establishes that the search of Jackson's vehicle did not occur until after the canine positively alerted twice to the presence of the odor of narcotics in Jackson's vehicle. The positive canine alerts provided probable cause to search Jackson's vehicle. *United States v. Trejo*, 551 F. App'x 565, 568 (11th Cir. 2014) ("This Court has long recognized that probable cause arises when a drug-trained canine alerts to drugs.") (citations and internal quotation marks omitted); *United States v. Nelson*, 309 F. App'x 373, 375 (11th Cir. 2009) ("In the case of dog sniffs, probable cause arises when a drug-trained canine alerts to drugs.") (citations and internal quotation marks omitted).  Because there was probable cause to search for narcotics in Jackson's vehicle, the undersigned need not determine whether Jackson's movement of bags or Officer Oliver's assertion of smelling

marijuana constituted probable cause to search Jackson's vehicle. The undersigned finds no Fourth Amendment violation.[20]

## IV. CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Defendant's motion to suppress (Doc. No. 17) be DENIED. It is further

ORDERED that the parties shall file any objections to the Recommendation not later than **January 13, 2023**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive, or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable. Failure to file a written objection to the Magistrate Judge's findings and § 636(b)(1) shall bar a de novo determination by the District Court of legal and factual issues covered in the Recommendation and waives the right of a party to challenge on appeal the District Court's order based on unobjected-to-factual and legal conclusions accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. 11th Cir. R. 3- 1; *Resolution Trust Co. v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993); *Henley v. Johnson*, 885 F.2d 790, 794 (11th Cir. 1989).

---

[20] The automobile exception clearly applies in this case. The evidence of record establishes that Jackson's vehicle was mobile and the canine's alerts provided probable cause. *Dyson*, 527 U.S. at 467. Further, "the probable cause gave the officers the right to search every part of the vehicle and its contents that may conceal the object of the search." *Anguiano*, No. 3:16CR342-WKW-SRW, 2017 WL 2766184, at *20 (internal citations and quotations omitted).

DONE this 29th day of December, 2022.

/s/ Jerusha J. Adams
JERUSHA T. ADAMS
UNITED STATES MAGISTRATE JUDGE